The first case for argument today is 2011-1455, ALCON RESEARCH v. APOTEX. Mr. Bryce Latt, whenever you're ready. Good morning, Your Honor. I've reserved five minutes for rebuttal. I'll try to keep track of that on the clock and by the lights. My name is Robert Bryce Latt from the law firm of Katten, Buchanan, and Rosamond, and with me at table is Mr. Craig Cucci from the same law firm. It's our position that the district court erred as a matter of law when it failed to find as obvious the use of olopatadine to treat allergic eye diseases. It failed to find it as obvious, even though the prior art showed us olopatadine, claimed it specifically, showed how to make it, said it was an anti-allergy, anti-dysthematic drug. It seems to me like at least part of what this boils down to is you've got numerous fact findings by the district court and you have to overcome them, except your argument seems to be that a lot of that is predicated on the result of mast cell stabilization, and that you say that that's not really a limitation and that's not something that really matters with respect to this case, right? Well, we say it is a natural result from using olopatadine at what the prior art says, 0.1%, to treat an allergic eye disease. You're going to get mast cell stabilization. If one looks back and says, what is it that Alcon did? Well, wait a minute. I think that you spoke incorrectly. You said the prior art teaches 0.1% of olopatadine to treat allergic eye disease, and that's not correct, is it? The prior art doesn't teach 0.1% of olopatadine. Your argument, as I understand it, is one of the statins says 0.1% of a different compound, but as I understand it, for example, the guinea pig prior art, Camai, only teaches up to 0.01% of olopatadine. Correct. But Weaver does teach deoxypen, and it says this is an example. It doesn't say it's only to this deoxypen derivative. Olopatadine is a deoxypen derivative. These chemicals are crazy. Just because you use 0.01 of one, maybe you have to use 0.01 of another one, and you didn't introduce any evidence into the record that suggested that one skill in the art would know that, for example, they would all work the same way at the same concentration. Birdie tells us, and the Alcon experts testify, that 0.1% is not an unexpected amount that you would use a eye drop, even including olopatadine in that. It is simply something in a dose-response curve you would test at and use. To say that 0.1% is something special, that no one had ever done it in an eye drop, that one wouldn't turn to that as an obvious measurement for an eye drop. But your argument now is that it's obvious, but your statement was that it was present in the prior art, and what I wanted to correct you on before you should answer Judge Perth's question, which goes back to the fact findings and things, when asked about cell stabilization, but what I wanted to correct you on was just the notion that 0.1% of olopatadine is not disclosed in the prior art. I disagree. I think when you have a... Show me which piece of prior art, what line, what column number it is present. 0.1% of olopatadine. Lieber, Example 8, where it talks about use of a dioxapine derivative in an eye drop at 0.1%. I'm on Lieber, so show me which column or line number it talks about olopatadine at 0.1%. It says dioxapine derivative. If you're looking for the word olopatadine, it does not appear there. Right. But is there any doubt that olopatadine is a dioxapine derivative? And the answer is no. But what do you do about the fact that the district court made very specific findings of fact, including findings of fact that certain of this prior art actually teaches away from what you're proposing, and those are findings of fact. Those are not legal conclusions. But the court can look at those, and you look at teaching away. Since when is it teaching away when a piece of prior art says that olopatadine is safe on human beings, it is better than the leading antihistamine, and that is the Hamilton, better than the leading antihistamine in the world, and that was their expert's testimony. It is better than that, and what it says is this is a wonderful antihistamine. We can't make a conclusion on mast cell stabilization because it doesn't show up in this test, at this dose. In 189, the district court found that it might be found to be bypassing, and therefore it taught away that a person's guilt in the art would not have been motivated to use the my at 1.1%. And I looked at those, and it's very interesting. What the court finds when he talks about biphasic is that all antihistamines, in fact, act as a mast cell stabilization to some point, and then, according to what he says, the literature at that point in time becomes biphasic, and it causes the release of histamine. There's no evidence of that at all in Hamilton. There's no evidence of that in Kame. So we know for a fact that they're not biphasic at those percentages because neither Hamilton nor Kame come out and say, oh, there's this. Here's the problem I have. The person of skill in the art is defined as a person would have years of postgraduate training and experience in developing and testing compositions or methods for treating allergic eye disease and would have the relevant knowledge and skills of a pharmacologist, an immunologist, and a medical doctor. Then we have specific findings of facts that, in each case, the district court points to expert testimony in the record. And the only testimony that you're offering is your expert who conceitedly did a backward-looking and improper obviousness analysis, and you're simply saying that we should put ourselves in the position of this expert and assume that we can read this prior art and we can come up with different conclusions than the actual testimony. No, I'm saying when you look at the testimony of the experts, the only thing their experts came down to say is no piece of this prior art showed specific mass cell stabilization in the eye. Every one of their experts agreed as to what it was that the prior art taught. And what the prior art taught was the use of olopatadine, the use of olopatadine as an antihistamine, the use of olopatadine to treat allergic conjunctivitis, which is a disease of the eye. Every one of the experts agreed that the use of guinea pigs is predictive of use of olopatadine in the human eye to treat allergic conjunctivitis. No, they did not. Oh, yes, they did. It's funny where the plaintiff's expert or the patent holder's expert specifically said that, because I believe that's not the case. We went through every single one of these signs of fact and matched them up with the statements in the record. They not only said that given the properties of olopatadine that you could not translate from one to the other. If I may, starting with, this is Derek for Abelson on A21, A23. And this is from the H63. I'm sorry, can you give us the slide again? A21, A23. The inventors are telling one skill in the art that this medication can be used on human beings, aren't they, sir? Answer three to four times a day. And no grant for programs would suggest, always does, a systematic dose. Sir, oh, sorry, it can be used on human beings. Isn't that right, sir? It absolutely can. That's A21, A23, and four. A21, A54. Again, Abelson, their expert. To one skill in the art, 0.1% has a starting point to do with dose response curve and an alfalma formulation would not have been out of the ordinary, would it, sir? Answer. It wouldn't have been out of the ordinary. But he didn't talk about it in the eye. He specifically says there's nothing in the literature prior to June of 1995 that suggests that olopatadine was a human conjunctival mast cell stabilizer. Prior to 1995, there's no data that shows that it acted as a mast cell stabilizer in any species or tissue. These are both from Abelson. Right, but remember what we're talking about here is that it's a method of action. What we're saying is one skill in the art would have used olopatadine at 0.1% to treat allergic conjunctivitis, which is what this patent is about. So when we look at Abelson at A21, 934, Dr. Abelson, Hamay teaches us that olopatadine is effective antihistamine, does it not? The answer, it does. What's the status of this case if we were to parse the claims and conclude that we're not finding 0.1% as obvious, and that's the claim limitation in what, Claim 4 and 8? Right. But then there are other lower dosages in the other claims that might be more problematic, some of which are found in Kami at least, right, the 0.01% and so forth, those ranges that go from 0.0001 to whatever. What happens with respect to this case in the ANDA here if we conclude that some of those claims are obvious and others are not? In other words, hypothetically, the 0.1% claims are not obvious. Well, if the 0.1% claim is not obvious, then the ANDA, then the product that is covered by the ANDA would be an infringing product, and it would be covered by a valid patent, because that's the dosage, 0.1%. That's what Abelson says, as I just read, would be one that one would expect to be used. So the case would ultimately be an affirmance if Claims 4 and 8 were upheld, even if the others were struck down. Yeah, if you struck everything down but 4 and 8, advocates would still not be able to sell a generic olopatadine product because it's listed as 0.1%. I see I'm in my rebuttal time. Unless the Court has another question, I'd like to save it. Thank you. Thank you. Mr. Chamgam, thank you, Judge Brooks. Hi, I'm Chamgam. I'm a Williamson colleague for the Alcon appellees. May I please the Court? In rejecting Apotex's obviousness defense, the District Court correctly found that the prior art did not teach, and in fact fought away from, using olopatadine as an absolute stabilizer in the human eye. Let me ask you, if hypothetically we were to accept the other side's argument that mass cell stabilization is not an effective limitation, and also that safety is not necessarily a limitation of these claims as opposed to efficacy, where does that leave your argument? Well, of course we disagree with both of those propositions, Judge Press, but more broadly, Apotex's whole argument here really stems from the assumption that mass cell stabilization is not a limitation, and that's precisely why Apotex seeks to invoke the doctrine of inherency. Now we think that that argument fails at the threshold, because in order to invoke the doctrine of inherency, Apotex really has to overturn three critical factual findings. First, the finding that a person of ordinary skill would not have had a motivation to focus on olopatadine as an antihistamine in the human eye. Second, the finding that a person of ordinary skill would not have had a reasonable expectation of success in developing olopatadine for that use. At all levels? What findings are you referring to now? The motivation finding, Judge Press, is at page 871. The finding on reasonable expectation of success is at pages 871-72, and it's repeated at page 811-12. Motivation seems to be entirely based on use of the mass cell stabilizer, though. Well, no, I actually think that finding is not limited, Judge Ward, to mass cell stabilization. The finding is that Apotex failed to introduce any evidence to show that among all of the compounds being studied, the person of ordinary skill would have focused on olopatadine. But finding 286 is based on nontoxic application, and why should we conclude that the claim requires a nontoxic formulation? Well, as we indicated in our brief, Judge Press, we really do believe that that is implicit in the language of the claim that requires the administration to be therapeutically effective, and if, in fact, administering this compound would be toxic, it could not be administered in a therapeutically effective manner. But even leaving that aside, I do want to get on the table of the third factual finding, which really goes to Judge Ward's earlier colloquy with my brother, Mr. Bryce, class. The third finding is the finding that the prior art did not teach or suggest using olopatadine at a concentration that stabilizes mass cells, such as 0.1%. Okay, hold on, hold on. So this is a point of concern for me, because your expert even said that he didn't think, for example, at 0.01 that there would be any mass cell stabilization. He said that expressly, right? At 0.001%. No, no, no, at 0.01%, not 0.001%, 0.01. Right, right. But your claim, too, let's look at your claim. Sure. You realize your claim, too, says the method of claim one, wherein the amount is between 0.0001 and 5%. So either you have an inoperative claim or what? I mean, you're standing here telling us it doesn't stabilize at 0.01, but your claim says it does. Sure. You claim it. This is a very important point, Judge Moore, and this was the point that Judge Crouse had raised earlier. With regard to the range of concentrations that are covered by these claims, the district court construed claim one, the independent claim, to require mass cell stabilization to a clinically relevant extent. And therefore, claim one requires the use of olopatadine at a concentration that stabilizes mass cells. And that restriction carries through to the dependent claim. And then what was your finding about what is clinically relevant? What is the dosage to be clinically relevant? Well, there wasn't a specific finding by the district court as to the relevant range. I thought he had said, am I wrong about this? I recall that the district court found it's between 0.1% and 0.01%. Didn't he rule out some of the ranges claimed in the dependent claims in his claim construction of claim one? That is correct. But to the extent that the dependent claims cover a broader range than the range that would be operative to stabilize mass cells, the limitation from claim one still carries through. So to the extent, for instance, Judge Moore, that claim two covers this conceivably broad range going down to 0.0001%, to the extent that there isn't mass cell stabilization, it wouldn't be covered by the claim by virtue of the limitation in claim one. In other words, the claim would be operative. No, it would be operative just at a narrower concentration. You don't get to do that. That's not how patent law works. You don't get to rewrite your claims and say, oh, you know what, half of what we claimed is inoperative, so we'll just keep the half that's operative. Well, at a minimum, the whole dispute... You've got to live and die by what you're claiming. Well, at a minimum, the whole dispute before the district court was the dispute over 0.1%, because Apotex's whole argument was that 0.1% was, in fact, obvious. And, again, that's precisely why the district court's factual finding on this point was the factual finding that there was no teaching or suggestion in the prior part to use a whole patented unit of 0.1%. And really, you know, I think that it's critical... I think that the court suggested the district court's holding of what would be a clinically appropriate amount extended beyond 0.1% didn't go down as low as 0.01%. Well, I think that's essentially implicit in what the district court found. It was only below that concentration, the district court said, quoting some of the testimony at trial, that there was no mast cell stabilization. But, again, I think it's important to realize that... So you think that the district court's implicit holding is clinically... It's clinically... What is the word? Relevant. Clinically relevant from 0.01% up to what? I don't think the district court found an upper bound. But you think the lower bound of the district court was 0.01? I think that's right, but I think that's because the district court thought that in the dependent claim, there was this limitation that was read through from the independent claim. So it's not a question of inoperability to the extent that you're talking about... And I realize that this is a little bit difficult because, on the one hand, you have an explicit range in the dependent claim. On the other hand, in claim one, you have this implicit limitation that you use it at a concentration that stabilizes mast cells. But if that carried through to the dependent claims, there's no operability problem, Judge Moore, because all that means is that the claim, although it might seem to cover a broader range, in fact doesn't. And so, again... Although it might seem to? You have an explicit range. You articulated the range. Right, but, again, the district court construed claim one to require mast cell stabilization. But is the district court allowed to rewrite claims? Well, I don't think that that is a rewriting of the claim, to be fair. And just to kind of put on the table the debate about claim construction in the district court, and it's not the subject of Apotek's appeal. In the district court, Apotek argued that the mast cell stabilization language in claim one covered even the minimum of mast cell stabilization. And that was really, I respectfully submit, in an effort to get this claim to cover ordinary anti-systematic... No, to get the claim to cover what the claim covers. Well, that... Right, I mean, that's a fair... You know, the district court construed clinically relevant. So, as Joe Jemora has said several times now, it doesn't include portions of the range. In claim construction, you can't sort of say, well, I'm going to accept part of the range with respect to enablement or description or whatever. It all lives or dies as one. Right, but to be fair, that was a construction that the district court gave. And again, it is not the subject of Apotek's appeal. So, I think this court really does have to take that construction as the correct construction here. And for purposes of the obviousness issue that is actually before this court on appeal, I think the critical takeaway from all of this is simply that we have a factual finding that there was no teaching or suggestion in the prior part to use OLPATA-D at 0.1% or any other mast cell stabilizing... I'm sorry. Let's assume we disagree with you. That's where I started a few minutes ago with respect to the mast cell stabilization limitation. Let's assume that we think that that's not necessarily something that's required, that the claims require. Where does that lead you? In other words, we either buy the inherency or do it a different way, forget it. Well, as a threshold matter, Judge Prose, even if you disagree with us about that, you would have to overturn all three of the factual findings that I have set on the table. And you would have to do more than that. You would also have to conclude, as a legal matter, not only that inherency could appropriately be considered in obviousness analysis, but also that inherency can be used to fill gaps between prior art references. Why would... I quite frankly don't understand the discussion of inherency in this case. If the prior art... If Kamei disclosed 0.1% in humans, not in guinea pigs, just 0.1% in humans, and it didn't say anything about mast cell stabilization, it would nonetheless fulfill all of the elements of Claim 4, would it not? If there were a piece of prior art that specifically disclosed using olipatidine in the human eye at 0.1%, then I would agree, Judge Moore, we might very well have an inherent anticipation problem. Why inherent anticipation? Mast cell stabilization, according to your expert and their expert, actually, at 0.1% is a given. So why is that a claim limitation? It's just saying what automatically happens. It's not adding another limitation. It is what happens. Well, the reason it's a limitation really goes back to the discussion that we were having earlier. When the District Court construed this claim language as requiring mast cell stabilization to a clinically relevant extent, the upshot of that was that olipatidine has to be used at a concentration that stabilizes mast cells. And the result of that is that we really are claiming a novel non-obvious method or process here, namely the process of using olipatidine at a concentration that stabilizes mast cells. Now, we believe that that process was not obvious from the prior art, leaving aside the question of mast cell stabilization. By virtue of the critical factual findings that the District Court made on motivation and reasonable expectation of success, again, even taking mast cell stabilization out of the equation. And that's really why, Judge Moore, we think this case doesn't present this Court with some opportunity to definitively resolve this vexed question of the appropriate role of inherency in obviousness analysis, because this Court would have to overturn not simply one or two, but all three of those factual findings simply to get to that question. And I would simply underscore one other point, which is that it does seem a little bit ironic that Apotex is invoking the doctrine of inherency, whereas here, the closest prior art affirmatively teaches away from using olipatidine as a mast cell stabilizer in the human eye, and where the objective indicia of non-obviousness point so overwhelmingly in Alcon's favor. In order to sustain Apotex's... But that same prior art discloses using 0.01 of olipatidine for an antihistamine effect, granted. But 0.01 of olipatidine is within, by your own admission, the clear claim construction of the District Court for what is clinically therapeutic for mast cell stabilization. So who cares if it says it doesn't actually mast cell stabilize if it really does, and everyone agrees it does? It discloses it. Well, I want to address the reliance on Kamea. I want to address it with specific reference to 0.1 percent, because after all, Mr. Weissblatt was attempting to argue earlier that you could use Lieber and Kamea in order to get to 0.1 percent. But I don't want you to do that. I want you to focus on 0.01 percent, because I'm not so concerned with 0.1 percent. What I'm concerned with is 0.01 percent and the impact on claims 1 through 3 and 5 through 7. So I don't want to use up all your time. I understand your arguments on 0.1 percent. I'm trying to figure out what to do with the rest of the claim. Well, sure. Well, I think with regard, again, we've had our discussion about the limitation in claim one, and I would respectfully submit that as sort of dispositive of this issue. But if you disagree with me on that, with regard to Kamea, the problem with relying on Kamea is really twofold. First of all, Kamea involved testing in the eye of a guinea pig. And as the district court specifically found, testing in the eye of a guinea pig is used only for purposes of determining efficacy. It isn't used for purposes of determining safety or tolerability in the human eye more generally. Even leaving that aside, a person of ordinary skill in the art would have concerns about using olive adenine in the human eye. And again, particularly to the extent that the discussion is about 0.1 percent, a person of ordinary skill would have been concerned about the bivasic effect. We're going to stick with 0.01 percent, remember? Right. Well, bivasic effect would always be a concern with using an antihistamine at higher concentrations because of the concern that if you do so, it leads to disintegration of mast cells with accompanying adverse effects. Right, but that's not at 0.01 percent because Kamei used it at 0.01 percent. It is true that Kamei used it at 0.01 percent. And again, I would fall back on my first-order submission that testing in guinea pigs is only of limited relevance by virtue of the fact that as apotex concedes, that testing is relevant only to show efficacy. It tells you nothing about safety or tolerability in the human eye more generally. And again... Where does the claim talk about safety rather than not efficacy? Where does the claim... Well, again, the language of the claim which talks about the administration being therapeutically effective, we believe, really imports a safety limitation. And again, notably, apotex did not argue to the contrary. But the district court didn't say that as part of its claim construction and you just told me that I can't revisit that claim construction. Apotex did not contest that in claim construction judgment. It's not presented as part of... The district court did not adopt that as part of their claim construction. That is true, but I think it is a little bit ironic now that apotex is making the argument that safety would not be implicit in a claim that is, after all, a claim to a method of using a compound in the human eye. And again... Hey, if you'd like us to revisit claim construction, I'm willing to do it, but it's wholesale. Would you like to make that concession now? No, we're not asking you  claim construction here. I'm simply making the point that this was not an argument that apotex itself raised in claim construction. And so I think it appropriately can be treated as way. But again, our fundamental submission here is simply that in order to reverse here, this court would have to overturn the three critical factual findings we've discussed, resolve a conceivably unsettled question about the role of inherency and obviousness analysis, and do so in the teeth of determinations by the district court that the objective of non-obviousness point in our favor and that the closest prior art teaches away from the claimed use. And that's why we're seeking affirmance. Thank you. Thank you. Please, Mr. Gordon. I want to go back and talk about the use of olipatidine at .1%. And that is, again, I mentioned it earlier and I want to hit it again. .1% isn't matched. .1% was an amount of antihistamine that people skilled in the arts in 1995 were using. As Dr. Abelson testified, to one skilled in the arts, .1% as a starting point to do a dose response curve in an ophthalmic formulation would not have been out of the ordinary. Would it, sir? It wouldn't have been out of the ordinary. In the very article he was one of the authors on, a 1991 article, they talk about antihistamines, their importance in treating eye diseases, they talk about topical antihistamines, the most commonly used drug to treat ocular hay fever, inhibit the allergic reaction, but in 1991 they noted that the only antihistamine preparation available for topical ophthalmic use was the .3%, and they give the name of the drug in a .5%. But the tagline of the Verde article, and if we go back to KSR, this is the place of Verde, even though it doesn't mention olipatidine, we don't ignore it. What is the tagline of Verde on page A5703? The basic methodology used in this survey may be a good process for preliminary identifying and evaluating compounds for potential use in ophthalmic disease. By the time 1995 rolled around and this patent application was filed, olipatidine had already been tested in an animal model to see if it would work against allergic conjunctive arthritis, that's Kamei, and it was found that it was one of the best, and a dose response curve. Yes, it only went up to .01%, because remember, we're doing it on a guinea pig. What are the percent... You're quoting from Ableton. He says, although Kamei tested olipatidine as an eyedrop at three concentrations that fall within some of the claimed ranges, the person of ordinary skill would not have had a reasonable expectation from Kamei that olipatidine would be effective at .1%. At that dosage, the person of ordinary skill would have been concerned that olipatidine might be found to be biphasic, and they would not have been motivated by Kamei to use olipatidine at a concentration of .1%. Now, that's what he said at trial. What he said in his article in 1991 is you go up to .3% and you test them. He was being very specific as to olipatidine and offering that suggestion, which is the exact opposite of what the prior art says, which is what one skill in the art would have relied on. Now what Dr. Ableton says at trial, what would one skill in the art have relied on? They would have relied on his article, which says you go to .3%. And that's why he also said it wouldn't be unusual for the same Dr. Ableton who said the one skill in the art, .1% is a starting point to do dose response curves in an albama formulation would not have been out of the ordinary. Now, how do you say on the one hand, well, wouldn't it have been out of the ordinary to use 1% as a starting point, write an article that says that's what you should use, and yet come into a courtroom and say, well, yeah, you know, somebody might have been afraid of the biphasic effect. He writes an article that talks about using and never mentions biphasic. But wait, we are not the court of first review here. You were before the district court. There was cross-examination about this. He explained it all at the time that the expert did, and the court made specific findings of fact about what one ordinary skill would have understood based on listening to all of the experts. But what you're telling us is that we should throw all that out and start over. We can't do that. No, I'm not asking you to do that. What I am saying is that when you have prior art that says you test antihistamines at 0.3% and 0.1%, and you have a piece of prior art, Lieber, which suggests dioxepin derivatives,   you can't ignore that, as this district court judge did. He makes a finding that one wouldn't even know that there was an antihistamine at 0.1%. He doesn't go forward because they were afraid of a biphasic effect, but he doesn't tell you what percentage a biphasic effect is. You don't know if you have a biphasic effect until you do a dose-response curve and find out. What expert testimony did you proffer that was different from the district court's findings? To the extent there are statements in the record that almost all of them are either statements supported by Alcon's experts or statements with a dose response curve that your expert made that were subject to impeachment because they were very different than statements he made during his deposition. I'll go back to what Abelson says. Abelson says the ones still in the arms, 0.1% is a starting point. To do a dose-response curve in an Alcon formulation would not have been out of the ordinary. Would it serve? Answer, it would not have been out of the ordinary. That's 821854. That's the heart of this. Not that one would have been afraid, but one would have done it. That's what their own expert said. It was not out of the ordinary. It's something one would have done. Even if you thought about biphagia, you still would have done it. It's not disputed. Their expert says it. It's Abelson. And his own article talks about going up 0.3%. I apologize for folding into my trial lawyer stance. I meant